**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 14 2016

JAMES W. McCORMACK, CLERK
By:_____
PLAINTIFF  DEP CLERK

**JAMES BARNES**

**v.**                              CASE NO. 4: 16 CV 750-SWW

**MARNIE OLDNER; KEVIN COMPTON;
STONE BANCSHARES, INC.;
J.T. COMPTON; NICK ROACH
and DAVID DUNLAP**

This case assigned to District Judge _Wright_
and to Magistrate Judge _Kearney_

**DEFENDANTS**

## COMPLAINT

COMES NOW the Plaintiff, James Barnes ("Barnes") by and through his undersigned counsel, Eichenbaum Liles, P.A., and for his Complaint states:

### Parties

1.      Plaintiff, James Barnes ("Barnes"), is a citizen of the United States, and resides in Stone County, Arkansas. This is an action based on claims related to Barnes' financial privacy, and Defendants' unconscionable and deceptive conduct, arising from and in connection with the purchase and sale of securities registered under the Securities Act of 1933 which occurred by means of Defendants' breach of their fiduciary duties as bank directors and officers of a National Bank doing business under the National Bank Act, referred to as Ozark Heritage Bank ("OHB"), with Stone Bancshares, Inc. ("SBI") its ultimate successor in interest.

1

2.     OHB was formed on or about March 3, 2009, through a Form S-1 Registration Statement under the Securities Act of 1933, resulting in the issuance of 537,566 shares of registered common stock, and separate preferred shares. At the closing of the initial offering of registered OHB stock, Barnes was the largest individual shareholder and a founder of the bank, who retained 75,000 shares of OHB common stock, and 17,500 shares of OHB preferred stock, and was voted in as chairman of OHB, and 9,800 options. The common stock retained a cumulative right to vote for the Directors of OHB.

3.     Defendant, Marnie Oldner ("Oldner"), is a citizen of the United States, a certified public accountant, resides at 8000 Hood Road, Roland, Arkansas 72135 and a resident of Pulaski County. She entered into an Employment Agreement on or about June 6, 2011, with OHB as an "Executive" [CEO], with a base salary of $150,000, and a "Performance" Bonus based on a mutually agreed formula. Oldner could be terminated for cause based on acts of dishonesty, fraud, moral turpitude, or securing any personal benefit or profit in connection with any transaction related to the bank. Oldner was a member of the Board of OHB and Stone Bank, and President of OHB in 2013, while also acting as CEO and CFO of OHB during all relevant time. She was also the owner of 9,250 shares of Stone Bank common stock, OHB's successor, as of December 31, 2015, according to Arkansas State Bank Department, and she aided, abetted, and facilitated Defendants'

2

actionable conduct set forth herein, and as a result, is equally liable. Stone Bank's Plan of Exchange dated December 14, 2015, provided that Defendant Oldner owned 19,000 shares of Stone Bank common stock, successor to OHB, as of that particular date.

4.      Defendant, Kevin Compton ("K. Compton"), resides at 14119 Belle Pointe Drive, Little Rock, Arkansas 72212 and is a resident of Pulaski County, the son of J.T. Compton, and was a member of the Board of OHB and Stone Bank during all relevant times. K. Compton was the owner of 2,444 shares of Stone Bank common stock as of December 31, 2015, according to Arkansas State Bank Department, and aided, abetted, and facilitated Defendants' actionable conduct set forth herein, and as a result is equally liable. Stone Bank's Plan of Exchange dated December 14, 2015, provides that Defendant K. Compton owned 104,453 shares of Stone Bank common stock, successor to OHB, as of that particular date.

5.      Defendant, Stone Banchsares, Inc., is an Arkansas corporation, organized and operating in the state of Arkansas as a holding company, owning all outstanding shares of Stone Bank, the successor to OHB, and whose agent for service is John E. Pruniski, III, One Riverfront Place, Suite 800, North Little Rock, AR 72114.

6.      Defendant J.T. Compton ("J.T. Compton") is a citizen of the United States, resides at 354 Old McIntire Lane, Mountain View, Arkansas 72560 and a resident of Stone County, was a member of the OHB Board, and is a member of the Board of its successor,

3

SBI, Stone Bank's holding company. J.T. Compton initially acquired 27,000 shares of OHB common stock and 17,500 shares of OHB preferred stock. By the time OHB was reorganized as a state bank in 2015, and renamed Stone Bank, J.T. Compton retained individually, and/or controlled, according to the Arkansas Bank Department, 612,588 shares of Stone Bank common stock, successor to OHB, as of December 31, 2015, including, upon information and belief, shares he acquired from former directors and customers of OHB, including Barnes, without notice or disclosure to OHB shareholders.

7.      Defendant, Nick Roach ("Roach"), is a citizen of the United States, resides at 2100 QMC Road, Mountain View, Arkansas 72560 and a resident of Stone County, was CLO of OHB and Stone Bank, and became President of Stone Bank in 2015. According to the Arkansas State Bank Department, Roach owned 8,139 shares of Stone Bank common stock, successor to OHB, as of December 31, 2015. Roach became a member of the OHB Board in 2013, and aided, abetted and facilitated Defendants' actionable conduct set forth herein, and as a result, is equally liable.

8.      Defendant, David Dunlap ("Dunlap"), resides at 3196 Highway 154, Oppelo, Arkansas 72110 and is a resident of Perry County, and was a member of the Board of OHB and Stone Bank, during all relevant times, and was the owner of 26,466 shares of Stone Bank common stock, successor to OHB, as of December 31, 2015, according to Arkansas State Bank Department, and facilitated Defendants' actionable

4

conduct set forth herein, and as a result, is equally liable. Stone Bank's Plan of Exchange dated December 14, 2015, provides that Defendant Dunlap owned 26,466 shares of Stone Bank common stock as of that particular date.

## Jurisdiction

9.      This court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C.A. § 1331, as this action arises under the Securities Exchange Act of 1934, § 10(b), 15 U.S.C. A. § 78j(b), and 17 C.F.R. § 240.10b-5, with supplemental claims under 28 U.S.C.A. § 1367.

## Venue

10.     Venue is proper pursuant to 28 U.S.C.A. § 1391(b).

## Factual Allegations

11.     After the formation of OHB in 2009, with Barnes as chairman, in 2012 J.T. Compton, as an OHB Director and fiduciary to Barnes as a customer and shareholder, began making personal loans to Defendant Oldner so she could acquire OHB common stock as an insider. Marvin Sutterfield ("Sutterfield"), an FSA consultant, was also a recipient of a loan from J.T. Compton, as a Director. These loans were part of J.T. Compton's scheme to remove Barnes, in order to ultimately gain control of OHB, however, J.T. Compton did not list these loans on his personal financial statement.

12.     J.T. Compton approached Barnes in mid-2012, directly and through the means and instrumentalities of interstate commerce, expressing his desire to purchase Barnes' OHB common stock at $10.50 per share. Barnes had paid $10.00 per share for the stock in the initial offering. As part of the transaction, however, J.T. Compton demanded that Barnes resign from the Board by no later than January 15, 2013, or the date he received the funds from the sale. Barnes rejected J.T. Compton's offer, which upset Compton particularly because during this particular time period OHB's overall financial condition was improving even as noted by the bank's regulators.

13.     In early 2013, continuing his scheme to gain control of OHB, J.T. Compton solicited Carl Cooper to once again become a member of the OHB Board of Directors (Cooper had threaten to sue the bank before) while Barnes was still serving as chairman. This was done to control the number of votes for the chairmanship at the April 2013 meeting, and assure J.T. Compton the chairmanship.  OHB's counsel opined on the procedure to be followed if the Board was unable to reach an agreement on the appointment of a chairperson, and there was a tie between two individuals for the chairmanship. As a result of J.T. Compton's actions, Defendants voted Cooper on the Board, and Barnes off as chairman, further facilitating J.T. Compton's unconscionable and deceptive conduct to force Barnes to sell him his OHB stock at below fair value. As part

6

of this contested election Defendants took a Directors oath to diligently and honestly administer the affairs of the Bank, and not violate their fiduciary duties.

14.     Ultimately, on April 21, 2013, as a direct result of J.T. Compton's actions, Barnes was removed as chairman, over his objection, in furtherance of J.T. Compton's scheme to gain control of OHB, with J.T. Compton voted in as chairman. Defendants aided, abetted, and facilitated J.T. Compton's deceptive and unconscionable conduct, with J.T. Compton stating to Barnes, and later confirming to the full Board, that if Judy Qualls, a Board member, did not vote Barnes out as chairman, he would "vote that b---- off the Board."

15.     On June 18, 2013, however, OHB Directors Buddy Bolin, Gladis Raney, Ron Willis, Kevin Compton, David Dunlap, Ron Sims, Marnie Oldner, J.T. Compton, Judy Qualls, and Fred Williams, approved a resolution of the Board of Ozark Heritage Bank, along with Carl Cooper, stating the following regarding Barnes:

> "**WHEREAS,** despite serving during a period of unprecedented economic challenges and uncertainty in the banking industry, his leadership on behalf of the bank contributed to its growth to $68,000,000 in total deposits in 2012 and the first quarter of 2013"
>
> **WHEREAS,** Mr. Barnes has been an untiring champion of the bank both in Stone County and Jefferson County.
>
> **WHEREAS,** Mr. Barnes has been a cherished friend and mentor to so many of us who learned the meaning of persistence and commitment to the bank from his example."

See, attached Exhibit "1."

16.     Shortly thereafter, in July of 2013, the OHB Board of Directors advised its federal regulators, the office of the Comptroller in particular, that it believed the issuance of a dividend on its preferred stock was appropriate based on year to date earnings through June 30, 2013 of $316,000, with the bank being profitable the last two quarters of 2012 while Barnes was chairman, with no distributions of dividends to date. Based on bank call reports, Tier 1 capital had risen from $5,544,900 on December 31, 2011 (9%), to $7,131,241 as of June 30, 2013 (11%), indicating excess capital of $1,268,753, all under Barnes's chairmanship.

17.     On July 1, 2013, OHB issued a statement that the book value of OHB common stock, as of June 30, 2013, was $11.86, without conversion of preferred shares to common. From January 2012 to June 2013, the substandard and doubtful loans of OHB had been reduced by 26.73% while Barnes was chairman of the Board.  Moreover, as of July 31, 2013, Barnes was in compliance with all Reg-O requirements regarding his loans with OHB, and otherwise maintained his loans in good standing under the terms of his agreement with OHB. As a contrast, there was one particular Board member whose loans were in question at this time, and whose Reg-O standing was in question, that was treated vastly different than Barnes.

18.   After reviewing Barnes' non-public financial information, on or about August 12, 2013, the Directors Loan Committee of OHB renewed his promissory note #604047, issued to James Barnes and Associates, Inc., in the principal amount of $597,555.88.

19.   With OHB's financial performance improving, and bank operations stabilizing, Defendant J.T. Compton enhanced his wrongful pursuit of removing Barnes from the OHB Board, to ultimately gain control of OHB and sell the bank at a substantial profit. During this time period, several Board members, Fred Williams, Ron Sims, Gladis Raney, Judy Qualls, and Marvin Sutterfield had co-signed a note with Barnes at Homebank of Arkansas, for $250,000 to payoff a loan with J.T. Compton which Barnes had used for refinancing other debt, in order to prevent the wrongful buyout of Barnes by J.T. Compton. The loan with J.T. Compton was secured by OHB stock. In response, shortly after the payoff, Oldner inquired with the OCC on how to neutralize the Director votes of these individuals, and requested an opinion from Jack Pruniski, a Little Rock attorney, of whether there were any restrictions when a director (insider) wanted to buy or sell OHB stock. Pruniski stated that for insiders, such as directors like the Defendants, written agreements should be executed to ensure proper disclosure to a party that was not an insider, in order to protect against "insider trading".

20.    Oldner also made calls during this time period to the OCC regarding erroneous issues concerning Barnes' loans with OHB, as did Carl Cooper, who told Barnes he would see him "under the jail." Any contact by Oldner or Cooper with the OCC in this manner was outside standard banking practices with regulators, and done solely to further the scheme to force Barnes to sell his stock in OHB to J.T. Compton, at below fair value. In light of his interest in removing Barnes, at the September 17, 2013 Directors meeting, J.T. Compton stated that there needed to be a review of the "Insiders Activity," with updated information and necessary "training."

21.    As he had done on several occasions in 2013, to which the Defendants were aware, Defendant Roach, as the Chief Lending Officer of the bank, assisted Barnes in preparing his personal cash flow and financial statements.  During this same time period, J.T. Compton and his "associates" became even more intent on solidifying his control of OHB. To further facilitate taking control from Barnes, Defendants manufactured false information regarding Barnes' application of funds from the sale of his cattle which were standing as collateral, and regarding his financial statements, which had even been prepared by Roach, in addition to false claims of "irregular" account activity. The bank's FSA consultant, Marvin Sutterfield, and the bank's "ag" lender, Daryl Sullivan, had in fact inspected the cattle and were aware they were being sold, consistent with accepted farm practices, and the terms of the OHB loan agreement, and told Marnie Oldner and

Nick Roach of his findings. In September 2013, Defendants passed a resolution purportedly based on "undisputed evidence" regarding the application of funds from Barnes' cattle sales, and what they claimed to be "check kiting", which according to Daryl Sullivan, was in fact not due to good funds being available. Sullivan also advised Oldner and Roach of his findings regarding this false contention. These claims were changed in a resolution passed on October 3, 2013, eliminating or rewording some of the false statements. The attempt to remove Barnes from the Board was illegal, and without right under Arkansas law, which was confirmed to the Defendants by the bank's legal counsel, and questioned by a representative of the OCC. The Defendants pursued the illegal action notwithstanding their knowledge of its illegality. See, attached Exhibit "4," the two resolutions.

22.     As members of the OHB Board, and loan committee, Defendants had access to Barnes's personal and propriety non-public financial information which he had submitted in support of his loan requests to the Directors Loan Committee. As fiduciaries, Defendants had a duty not to misuse or misappropriate Barnes's information. Such non-public information was prohibited from being used by the Defendants in any manner to further their personal interests. Other borrowers who were OHB shareholders had also submitted personal non-public financial information to the Directors Loan Committee, with some of the borrowers also debtors of J.T. Compton.  Upon information and belief,

in furtherance of his scheme, J.T. Compton, with the knowledge of other Board members, forced a number of customers (borrowers) of OHB to sell their stock in OHB to him, or his intermediary, by misappropriating such non-public information.

23.     As Directors and officers of OHB, at all times throughout their tenure as members of the OHB Board, and its successors Stone Bank and SBI, Defendants were also charged with a duty of loyalty to act in the best interest of its shareholders and customers, including Barnes, not to self-deal or misappropriate Barnes's non-pubic proproriety financial information, and a duty to ensure that as insiders they did not abuse their fiduciary position of trust for their personal benefit by misappropriating their knowledge of proprietary non-public customer information, to the detriment of an OHB customer such as Barnes, and others, and were at all times required to avoid any conflicts of interest regarding their personal business interest or desires, as well as their families, and abstain from any such transaction which could violate this duty.

24.     Notwithstanding their clear fiduciary duties, J.T. Compton and his associates continued their manipulative, deceptive and unconscionable scheme to force Barnes out of OHB at a substantially below market price, by using his knowledge of Barnes's non-public proprietary financial information to pressure Barnes to remove himself from the Board, or freeze him out with direct and indirect threats regarding his loans. J.T. Compton's actions were done without appropriate disclosures, and without

otherwise providing an opportunity for OHB to acquire Barnes's shares as Treasury stock at book value.

25.     Continuing his "squeeze" on Barnes, J.T. Compton told Barnes that while he could resubmit his request for the Board to reconsider its decision demanding that he step down from the Board, he did not believe that any further explanation would be helpful. Defendants rejected Barnes offer to take a "leave of absence", as suggested by legal counsel, who drafted a letter so Barnes could deal with personal issues, which were ultimately favorably resolved.  Instead, Defendants continued to misappropriate Barnes' proprietary financial non-public information, while wrongfully removing Barnes from the Board, all to enhance their personal self-interest, at Barnes expense and substantial loss of equity.

26.     Notwithstanding   the   unconscionable   use   of   Barnes's   non-public proprietary financial information to pressure Barnes to resign from the OHB Board, and acquire his OHB shares at below fair value, Barnes refused to voluntarily remove himself from the OHB Board.  Moreover, Barnes was never advised of nor shown any direct demand by regulators that he be removed, notwithstanding J.T. Compton's threats of such. Moreover, OHB had not "classified" any of Barnes' notes. Defendants' actions were nothing more than a cooperative and willful misuse of their knowledge of Barnes's non-public personal financial information to force Barnes into a situation where he had no

choice but to sell his interest in OHB at substantially below fair value to J.T. Compton, and his family, with whom Defendants were aligned, or face foreclosure. As of September 29, 2013, the OCC had not interviewed Barnes, nor was Barnes directly aware of any negative position from OHB regulators regarding his loans. Notwithstanding such, Defendants continued to publish false information and misuse their knowledge of Barnes's non-public personal proprietary financial information to pressure Barnes into resigning from the OHB Board.

27. During the first week of October 2013, knowing he had to get Barnes off the OHB Board in order to gain control of OHB, J.T. Compton contacted Barnes again via email, wanting to know whether he had "changed his mind" regarding his voluntary removal from the OHB Board. It was during this period when J.T. Compton, Marnie Oldner, and Nick Roach, represented to Barnes that OHB would "work with him" regarding his loans at OHB, if he left the Board without incident, even though Barnes had cumulative voting rights. This false promise was another part of the Defendants' scheme to acquire Barnes' stock, and remove him "peacefully" from the Board. On or about October 3, 2013, J.T. Compton convened an Executive Committee meeting, with Defendants K. Compton and Oldner in attendance. After approving a revised resolution which made material changes from the September 2013 resolution by removing any reference to "undisputed evidence", and changing check kiting to "irregular activity" (Ex.

"4"), J.T. Compton reminded the Committee that Oldner's contract called for a "stock" incentive plan, which the Board thereupon approved to be developed in 2014, after Barnes was removed.

28.     During approximately the same time period in early October 2013, OHB issued a statement providing that the book value per common share of stock was $11.41, undiluted by preferred shares.  Notwithstanding the inaccuracy of the claims Defendants manufactured against Barnes, on or about October 3, 2013, the "revised" resolution of the OHB Board of Directors was adopted by these Defendants, publishing the erroneous information regarding Barnes's financial statements, which Defendants knew Roach had assisted in preparing; the sale of certain cattle which were standing as collateral for the bank, which Barnes had advised Marvin Sutterfield, Daryl Sullivan, and Nick Roach, were being sold consistent with the terms of the loan agreement; which was seconded by David Dunlap, to be effective no later than October 18, 2013 at 2:00 P.M. Barnes has reason to believe Defendants published this false information to the OCC, with Barnes now being an outsider. See, attached Ex. "4".

29.     In contrast to Barnes' treatment, OHB's CEO and President, Defendant Oldner, borrowed money from J.T. Compton to acquire stock in OHB, but failed to note the loan on her financial statement, and later borrowed $50,000 from OHB to pay J.T. Compton back, representing that it was to buy investment property in California, which

was not true, however, to Barnes' knowledge Oldner's conduct was never sanctioned by the Board according to her employment contract.

30.    The issuance of personal loans by J.T. Compton to various OHB Board members, officers, and staff, was part of his scheme to use leverage to gain control of OHB, however, to Barnes' knowledge such conduct was never sanctioned by the Board.

31.    After Barnes was forced off the OHB Board by the Defendants, on or about October 17, 2013, J.T. Compton set up what he referred to as an "informal" investors meeting, where the "future" of the bank was discussed, indicating it would be an "unofficial and informal" meeting, of only the largest shareholders. Barnes was not notified of this meeting, nor advised of the agenda. Besides, this type of meeting was not provided for in the OHB By-laws, which required notice to all shareholders.

32.    On or about October 27, 2013, Defendant J.T. Compton contacted Barnes again via email, representing that there was purportedly "pressure" from the OCC regarding the status of Barnes's loans with OHB, however, as of this date, the loans were properly collateralized and in good standing and Barnes had never attended any meeting with any regulator regarding his OHB loans.  Using his knowledge of Barnes's non-public personal financial situation, J.T. Compton continued to pressure Barnes to sell his stock using the OCC as leverage, all in direct breach of his fiduciary duties. J.T. Compton also

advised Barnes that he would not be receiving any counterproposals from the OHB Board allowing him to stay on the Board, adding more pressure to Barnes situation.

33. On or about November 4, 2013, knowing he had Barnes in an untenable situation, Compton again contacted Barnes, suggesting he would loan Barnes funds to facilitate Compton's undisclosed purchase of Barnes' 75,000 OHB shares, at $7.50/share, substantially below fair value. This "loan shark" technique was part of J.T. Compton's scheme to gain control of Barnes' stock at substantially below fair value. At this point, J.T. Compton and the Defendants left Barnes with nothing but a "Hobson's" choice, being no real choice, either sell the stock, or the bank will foreclose. *Monell v. City of New York Department of Services, 436 U.S. 658 (1978).* If Barnes refused, J.T. Compton could direct that his loans be called, as they were all "demand notes." Besides, Barnes was not in a position to solicit outside buyers of his stock at a fair price. At all times after October 18, 2013, Barnes was an "outsider" and Defendants were "insiders", with full access to Barnes's non-public proprietary financial information.

34. Continuing their pressure on Barnes, Defendants demanded Barnes sell his cattle farm, which he did for $1,650,000 on December 28, 2013. However, prior to the sale, on or about December 23, 2013, under a threat of foreclosure, Barnes was forced to execute a second mortgage on his cattle farm, although he had made his annual FSA loan payment of $99,000 in June of 2013, and the loan was otherwise properly collateralized,

17

with approximately $402,000 in equity after the first mortgage of $1,200,000. Without explanation or right, Roach and Older held the cattle farm sale proceeds in a non-interest bearing account without applying them to Barnes' loans, to manipulate the bank's numbers and year end stock price, and to continue the economic pressure on Barnes, while purporting to commit to fund another cattle farm, the terms of which were unreasonable and not within FSA compliance.

35.     During this same time period, after Barnes was forced off the Board, OHB was released from its Consent Order with the OCC, and began its "rebranding" process, while seeking a state charter for the bank. On or about April 8, 2014, OHB issued a statement regarding "book value per common shares outstanding-undiluted", contending that as of March 31, 2014, apparently as a result of the conversion of a substantial number of preferred shares since September of 2013, the book value of OHB common shares was purportedly $8.23. The timing of any alleged conversion of preferred shares was consistent with J.T. Compton's scheme to gain control of Barnes's OHB shares at below fair value.

36.     Upon information and belief, it appears the involuntary stock sale to J.T. Compton from Barnes was not finally closed until mid-2014, as a direct and proximate result of Defendants manipulation, deception, oppression, and unconscionable use of Barnes' non-public personal proprietary financial information. Barnes has reason to

believe sale proceeds were delivered to First Tennessee Bank, the lienholder on the stock, prior to Barnes even signing an agreement to purchase the stock, with J.T. Compton paying Barnes funds as part of the purchase price several months prior to the execution of the purported March 23, 2014 Stock Purchase Agreement. Under the circumstances, any such attempt to "back-date" a stock purchase agreement must be deemed void.

37.     On or about July 26, 2014, Jim Johnson, Senior Vice-President of Special Assets OHB, issued a statement that "Ozark Heritage Bank has incurred no losses as a result of the lending relationship with Mr. Barnes." See, attached Exhibit "2".

38.     On or about August 6, 2014, the Compton Children Investment Trust, James Kent Compton, Charles Compton and Chris David Compton as trustees, acquired Plaintiff's 5,000 shares of OHB preferred stock for $47,500.

39.     In May of 2015, shortly after Barnes was forced to sell his OHB shares at substantially below fair value, a Notice of Special Meeting of Shareholders was issued, to consider a proposal to convert OHB to a state bank, adopt new articles, and change the name of the bank to "Stone Bank". These plans had never been discussed with or disclosed to Barnes while he was on the OHB Board, or before he sold his OHB stock to J.T. Compton.

40.     In December of 2015, J.T. Compton, as chairman of the Board of Stone Bank, successor to OHB, delivered a Notice of Special Meeting of Stockholders to be held on

December 14, 2015, for the purpose of considering and voting on a plan of exchange agreement, whereby Stone Bancshares, Inc. would acquire all the outstanding common stock of Stone Bank, to be effective through Ark. Code Ann. §23-48-601, *et seq.* According to Defendant Compton, and the notice:

> "The acquisition of the stock by the holding company should facilitate future capital infusions and more strategic flexibility on considering potential acquisitions, formations of subsidiaries and more efficient use of the management and resources of the holding company as it grows."

Barnes had never been advised of these plans while he was an OHB shareholder, or as an OHB Board member. The information related to the Executive Stock Plan; the charter and name change; and the plan of exchange, was material, and not disclosed to Barnes, prior to the sale of his OHB shares to J.T. Compton.

41.     At the time of the issuance of the notice and proxy in 2015, there were 1,338,370 shares of common stock of OHB's successor, Stone Bank, issued and outstanding, and the members of the Board were Buddy Bolin, J.T. Compton, Kevin Compton, David Dunlap, Margaret "Marnie" B. Oldner, Ron Sims, Gladis Rainy Webb and Fred Williams. J.T. Compton was the chairman of the Board. Kevin Compton is J.T. Compton's son, who has served as a Director since June of 2011.

42.     On or about April 8, 2016, Kevin Compton, as chairman of the Board of Stone Bancshares, Inc., issued a notice of annual meeting of SBI shareholders to be held

on April 19, 2016 to elect four (4) directors, Kevin Compton, J.T. Compton, Sonya Daniels, and Marnie Oldner, and also to adopt the Stone Bancshares Executive Stock Plan. The purpose of the plan was purportedly to advance the interest of certain employee shareholders, such as Oldner, and Roach, as determined by the "committee", and to allow the committee to determine what the option price for the stock would be, and included subjective "awards" of restricted stock. Notwithstanding the materiality of such changes, Barnes was never made aware of any such plan changes, which were apparently discussed at the October 2013 Executive Committee after Barnes was forced off the Board.

43.     On August 3, 2016, an application for change of control for Compton Stone Quarry Family Limited Partnership, LLLP, to acquire stock of Stone Bancshares, Inc., was submitted to the Arkansas State Bank Department. Under the terms of the application, "J.T. Compton, Charles Kevin Compton, Chris David Compton, James Kent "Ken" Compton," requested a transfer of their privately held shares of common stock of Stone Bancshares, into a newly formed qualified limited family partnership known as "Compton's Stone Quarry Family Limited Partnership, LLLP," with the only assets held to be 568,538 shares of the common stock (42.48%) of Stone Bancshares, Inc. At the time of the application there were 5,000,000 authorized shares of common stock of Stone Bancshares, Inc., of which 1,338,370 shares were issued and outstanding. According to the application, the above described general partners are part of the Compton Family

21

"Control Group", which collectively owned 732,527 shares (54.73%) of SBI, as of August 3, 2016. See attached Exhibit "3".

44.     J.T. Compton had accomplished his goal and effected his "control plan" with the state filing, while wrongfully acquiring Barnes' 75,000 shares of common stock at substantially below fair value, in a blatant breach of his fiduciary duty to Barnes. To date, the bank, and these individual Defendants, continue to dishonor their representations to Barnes regarding "working with him." Moreover, to the extent the individual Defendants acted under color of the scope of their duties and responsibilities as Directors or officers of OHB, or its successor, Defendant SBI, their conduct is imputed to Stone Bancshares, Inc., as well as said Defendants being separately and personally liable for their actionable conduct.

## COUNT 1

### Violation of Securities Exchange Act of 1934

45.     Plaintiff restates and re-alleges each and every matter as set forth in paragraphs 1-44, hereinabove.

46.     The acts, statements, and conduct of the Defendants constitutes a violation of the Securities Exchange Act of 1934 § 10(b) as amended, 15 U.S.C.A. § 78j(b), which provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any

national securities exchange - (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities – based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commissioner may prescribe as necessary or appropriate with public interest or for the protection of investors.

47.     17 C.F.R. § 240.10b-5, which implements section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j, provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud; or (c) to engage in any act, practice, or course of business which operates, or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

48.     As a direct and proximate result of Defendants violation of the Securities Exchange Act of 1934, and Rule 10b-5, Plaintiff has been damaged in excess of $4,050,000.

## COUNT 2

### Violation of the Arkansas Deceptive Trade Practice Act

49.     Plaintiff restates and re-alleges each and every matter as set forth in paragraphs 1-48, hereinabove.

23

50.     The course of dealings between the Defendants and Plaintiff, as set forth in

the preceding paragraphs, which includes, *inter alia* (1) Defendants' misuse, conversion,

and misappropriation of Plaintiff's non-public personal financial propriety information,

and funds, for their own use and benefit/self-interest; (2) concealment from Barnes of

contemplated material matters regarding OHB; (3) publication and resolution of false

information regarding Barnes's banking relationship with OHB; (4) the ultimate removal

of Barnes from the Board of OHB based on false information; (5) the forced sale of Barnes'

OHB stock under oppressive economic pressure for substantially below fair value; (6)

erroneous representations and publication to the OCC of Barnes's financial status with

the bank; and (7) violations of an officer's employment contract, are all part of

Defendants' unconscionable, oppression, and deceptive scheme to wrongfully remove

Barnes from the OHB Board, and gain control of Barnes' interest in OHB at substantially

below fair value, for their self-interest, notwithstanding Barnes' status as a customer of

OHB who had entrusted his non-public financial information to the Defendants as

fiduciaries, which Defendants exploited and misappropriated to the detriment of Barnes.

Such conduct is an affront to any sense of decency or reasonableness.

51.     Defendants' actions and conduct constitute a clear violation of the Arkansas

Deceptive Trade Practice Act, codified under Ark. Code Ann. §4-88-107(a)(10), which

24

prohibits **any** business **or person** from engaging in any unconscionable, false or deceptive acts in business, commerce or trade.

52.     In particular, Ark. Code Ann. §4-88-113(f), provides that any *person*, such as Barnes, who suffers actual damages or injuries as a result of a violation of the act, may recover actual damages and reasonable attorney's fees. Plaintiff Barnes is such a person, whether within his business relationship with the bank as a stockholder or as a consumer/customer of OHB. Barnes has been damaged as a direct and proximate result of Defendants' unconscionable, deceptive, oppressive, and fraudulent conduct, as described hereinabove, in an amount to be determined at trial, in excess of $4,055,000.00.

## COUNT 3

### Breach of Fiduciary Duty

53.     Plaintiff restates and re-alleges each and every matter as set forth in paragraphs 1-52, hereinabove.

54.     At all times during Barnes' relationship with OHB, and its successors, Stone Bank, or SBI, Defendants, as Directors, and/or officers, were fiduciaries, and charged with *inter alia* a duty of good faith, inherent fairness, full disclosure, and fair dealings as to Barnes, a customer and shareholder of OHB. This duty is subject to rigorous scrutiny, at even higher standards than normally apply to fiduciaries, when acting both as a Director and officer. As fiduciaries, Defendants were also charged with a duty of loyalty to act in

the best interest of OHB's shareholders, including Barnes, and a duty of full disclosure of all material facts, to ensure that as insiders, they did not abuse their position of trust as fiduciaries by self-dealing through the use of oppressive means, to the detriment of Barnes, an OHB stockholder and customer, and were at all times required to avoid conflicts of interest regarding their personal business interests, or desires, as well as any personal business interests or desires of their families.

55.     Defendants breached their fiduciary duties to Barnes as described hereinabove, resulting in substantial damages to the Barnes, in an amount to be determined at trial, in excess of $4,055,000.00.

## COUNT 4

### Violation Arkansas State Securities Act

56.     Plaintiff restates and re-alleges each and every matter as set forth in paragraphs 1-55, hereinabove.

57.     The acts, conduct, and statements of the Defendants constitute a violation of the Arkansas State Securities Act, particularly Ark. Code Ann. § 23-42-502, which provides that it is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to employ any device, scheme, or artifice to defraud; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

26

58.     As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in excess of $4,050,000.

## COUNT 5

### Conspiracy

59.     Plaintiff restates and re-alleges each and every matter as set forth in paragraphs 1-58, hereinabove.

60.     J.T. Compton, Nick Roach, Marnie Oldner, Kevin Compton, and David Dunlap, entered into a conscious agreement to pursue a common plan or design to violate the federal securities laws, the Arkansas State Securities Act, the ADTPA, Barnes's financial privacy, and otherwise breach their fiduciary duties to Barnes. Defendants actively took part in, and facilitated said violations of the federal securities Act, the ADTPA, the Arkansas Securities Act, breach of Barnes's financial privacy, and breach of their fiduciary duty to Barnes.

### Punitive Damages

61.     Defendants' actions were such that they knew, or should have known, in light of surrounding circumstances and their fiduciary duties as Directors, that their conduct would naturally and probably result in damages to Barnes, yet they continued their unconscionable and deceptive conduct in reckless disregard of the consequences from which malice may be inferred, and punitive damages should be awarded.

62.     Plaintiff demand a jury trial on all issues and claims.

WHEREFORE, Plaintiff prays that the Court enter an appropriate judgment against the Defendants, jointly and severally, in excess of the amount necessary for federal jurisdiction; for his costs and fees; and for all other just and proper relief to which he may be entitled.

Respectfully submitted,

**EICHENBAUM LILES P.A.**
124 West Capitol, Suite 1400
Little Rock, AR  72201
Phone: (501) 376-4531
Fax: (501) 376-8433
Email: jpenick@elhlaw.com

By: _/s/ James H. Penick, III_
**James H. Penick, III (ABN 81129)**
_ATTORNEYS FOR PLAINTIFF_

## VERIFICATION

**STATE OF ARKANSAS** )

                           ) ss

**COUNTY OF PULASKI** )

        I, JAMES A. BARNES, Plaintiff, upon my oath, state that I have read the foregoing Complaint and the facts set out there are true and correct to the best of my knowledge and belief.

_Jams Barnes_

JAMES BARNES

       Subscribed and sworn to before me, a Notary Public, this _14th_ day of October, 2016.

_Markita Watts_

Notary Public

My Commission Expires:

_January 21, 2026_

```
MARKITA A WATTS
PULASKI COUNTY
NOTARY PUBLIC -- ARKANSAS
My Commission Expires Jan 21, 2026
Commission No. 12696535
```

## Resolution Honoring

# James A. Barnes

## Bank Organizer and Past Chairman (2009-2013)

**WHEREAS,** James A. Barnes shared a vision with others that community banking was important to Mountain View, Stone County, Arkansas; and

**WHEREAS,** He was one of the original organizers of Ozark Heritage Bank, N.A. working with them to successfully raise capital ......... ed community bank; and

**WHEREAS,** Mr. Bar........ appointed to serve as Chairman of the Board of Direc... has served as Chairman from inception in April 2009 to May 2013; and

**WHEREAS,** He also served on committees including Directors' Loan Committee, and started the Advisory Board that has helped, and continues to help, Ozark Heritage Bank meet the needs of ... ...... ...... through volunteerism, donations, and customer service excellence; and

**WHEREAS,** despite serving during a period of unprecedented economic challenges and uncertainty in the banking industry, his leadership on behalf of the Bank contributed to its growth to $68 million in total asset, and profits in 2012 and in the first quarter of 2013; and

**WHEREAS,** Mr. Barnes has been an untiring champion of the Bank in both Stone County and Jefferson County; and

**WHEREAS,** Mr. Barnes has been a cherished friend and mentor to so many of us who learned the meaning of persistence and commitment to the Bank from his example.

**NOW, THEREFORE, BE IT RESOLVED** that the Board of Directors on behalf of Ozark Heritage Bank, its officers and employees presents this **RESOLUTION** and commemorative plaque upon **James A. Barnes** in sincere gratitude and appreciation for his dedication and commitment to the Bank; and

**BE IT FURTHER RESOLVED** that this **RESOLUTION** be presented to **James A. Barnes** and a copy of this document be placed in the official files of the Board of Directors as part of the permanent record of the Bank and as a lasting tribute to the accomplishments and contributions of **James A. Barnes** as an Organizer and as Chairman of the Board of Ozark Heritage Bank from its inception to May 2013.

*Adopted by the Board of Directors of Ozark Heritage Bank, N.A.*
*by unanimous consent this the 18th day of June 2013.*

Buddy Bolin, Director

Kevin Compton, Director

J.T. Compton, Chairman of the Board

Carl Cooper, Director

David Dunlap, Director

Andy Quattlebaum, Director

Gladys Bixby, Director

Tom Ivey, Director

Thad Williams, Director

Ron Willis, Director

Marvin Childers, President, CEO, Director

**EXHIBIT**

1

*Attested to this 18th day of June 2013 by:*

Pam Sutton

Pamela Sutton, Corporate Secretary & Cashier

# Ozark Heritage
# Bank N.A.

July 16, 2014

To Whom it may concern at Westmoreland Equity Fund:

The Purpose of this correspondence is to outline the relationship and payment history of James Barnes with Ozark Heritage Bank.  James Barnes has been a loan customer of Ozark Heritage Bank since 2009 and, to date, Ozark Heritage Bank has incurred no losses as a result of the lending relationship with Mr Barnes.

Please review the table below and refer any questions to me.

Sincerely,

Jim H Johnson
**Senior Vice President / Special Assets Officer**
**Ozark Heritage Bank**
802 E. Main St.
Mountain View, AR 72560
Office 870.269.7311
jjohnson@ozarkheritagebank.com

| Ln # | Current Balance | Times 30 Days Past Due | Last Payment Past Due | Next Payment Due |
|------|-----------------|------------------------|------------------------|------------------|
| 602247 | $ 92,412.57 | 0 | ---- | 8/25/2014 |
| 602488 | $141,597.22 | 3 | 5/29/2014 | 6/26/2014 |
| 602987 | $158,922.39 | 2 | 3/11/2014 | 9/9/2014 |
| 604047 | $243,406.35 | 1 | 2/12/2014 | 7/12/2014 |



EXHIBIT
2



| Current Compton Family Ownership of Stone Bancshares, Inc. as of 6/8/16 | | | |
|---|---|---|---|
| Individual | Shares Issued | % ownership of Stone Bancshares (1,338,370 shares) | Relationship to James Troy "J.T." Compton |
| James Troy "J.T." Compton | 448,529 | 33.51% | - |
| Lauren Ashley Compton | 526 | 0.04% | Granddaughter |
| Charles Kevin Compton | 54,003 | 4.03% | Son |
| James Kent "Ken" Compton | 56,503 | 4.22% | Son |
| Kris David Compton | 54,003 | 4.03% | Son |
| Kevin Compton Revocable Trust (Kevin Compton TTEE) | 2,444 | 0.18% | Son |
| Daniels Family Trust DTD 7/12/2006 (Charles and Sonya Daniels Co-TTEEs) | 67,745 | 5.06% | Niece (Sonya is Niva Lancaster's daughter) |
| Douglas Lancaster Trust (Sonya Daniels TTEE) | 9,750 | 0.73% | Niece (Sonya is Niva Lancaster's daughter) |
| Niva Lancaster Revocable Living Trust (Niva Compton Lancaster TTEE) | 8,691 | 0.65% | Sister |
| Niva Compton Lancaster GST Exempt Trust (Niva Compton Lancaster TTEE) | 30,333 | 2.27% | Sister |
| TOTAL COMPTON FAMILY CONTROL GROUP | 732,527 | 54.73% | |

| Proposed Compton Family Ownership of Stone Bancshares, Inc. Post Transfer to Compton Stone Quarry Family Limited Partnership, LLLP | | | |
|---|---|---|---|
| Individual | Shares Issued | % ownership of Stone Bancshares (1,338,370 shares) | Relationship to J.T. Compton |
| Compton Stone Quarry Family Limited Partnership, LLLP | 568,538 | 42.48% | See footnote [1] |
| Kevin Compton Revocable Trust (Kevin Compton TTEE) | 2,444 | 0.18% | Son |
| J.T. Compton GST Exempt Trust | 42,000 | 3.14% | - |
| James Kent "Ken" Compton | 2,500 | 0.19% | Son |
| Lauren Ashley Compton | 526 | 0.04% | Granddaughter |
| Niva Lancaster Revocable Living Trust (Niva Compton Lancaster TTEE) | 8,691 | 0.65% | Sister |
| Niva Compton Lancaster GST Exempt Trust (Niva Compton Lancaster TTEE) | 30,333 | 2.27% | Sister |
| Daniels Family Trust DTD 7/12/2006 (Charles and Sonya Daniels Co-TTEEs) | 67,745 | 5.06% | Niece (Sonya is Niva's daughter) |
| Douglas Lancaster Trust (Sonya Daniels TTEE) | 9,750 | 0.73% | Niece (Sonya is Niva's daughter) |
| TOTAL COMPTON FAMILY CONTROL GROUP | 732,527 | 54.73% | |

[1] *The general partners of the Compton Stone Quarry Family Limited Partnership, LLLP will be made up of James Troy "J.T." Compton and his three sons: James Kent "Ken" Compton, Charles Kevin Compton and Kris David Compton; each of these four general partners are also limited partners of the Compton Stone Quarry Family Limited Partnership, LLLP.*

EXHIBIT
3

## OZARK HERITAGE BANK, NA
### RESOLUTIONS OF THE BOARD OF DIRECTORS
### Tuesday, September 17, 2013

**Whereas**, based on undisputed evidence, it appears to the Board that James Barnes sold property securing a debt to Ozark Heritage Bank, N.A. (the "Bank") without repayment to, or the consent of,theBank between July 2012 and April 22, 2013, failed to disclose certain debts in December 31, 2012 and June 30, 2013 financial statements submitted to the Bank for the purpose of obtaining or renewing loans with the Bank, and

**Whereas**, James Barnes did not discuss the sale of cattle with the Directors' Loan Committee or the Board of Directors during the period from July 2012 through April 2013 when the cattle was sold, and

**Whereas**, recent activity within Mr. Barnes' deposit accounts with the Bank appear to management and the Bank's compliance expert from Bankers Assurance to strongly suggest check kiting, and

**Whereas**, another banking institution has initiated public foreclosure proceedings against Mr. Barnes, and

**Whereas**, the impact of any of the above actions has negative implications to the Bank, then

**Be it resolved** that the following motion was unanimously approved by all members of the Board of Directors, with the exception of Mr. Barnes:

**Motion** by Buddy Bolin – Despite the explanations provided today to the board by Jamie Barnes, some of which may explain certain of the activities under discussion and of concern, I still believe it is in the best interest of the Bank and move to approve the resolution recommended by the Executive Committee that reads:  Because of the sale of OHB-mortgaged collateral, apparent misrepresentation of information on his financial statements both at December 2012 and June 2013, as well as the fact that he has not been forthcoming to the board of directors regarding these matters, and because of the negative impact the public legal action pending against him by another financial institution has on OHB, we regretfully recommend to the Board of Directors that they approve a resolution requesting that James Barnes voluntarily resign his position as Director of Ozark Heritage Bank, N.A. no later than Friday, September 20, 2013 at 5:00 p.m.**Motion** was seconded by David Dunlap.Following discussion a vote was taken and the **motion carried unanimously.**

**Be it further resolved** that the Board of Directors believes that it is in the best interest of the Bank for James Barnes to resign as a director of the Bank and therefore regretfully requests the voluntary resignation of James Barnes from the Board of Directors of Ozark Heritage Bank, NA no later than Friday, September 20, 2013 at 5:00 p.m.

Pam Sutton, Corporate Secretary & Cashier

PLAINTIFF'S EXHIBIT 4

**OZARK HERITAGE BANK, NA**
**RESOLUTIONS OF THE BOARD OF DIRECTORS**
**Thursday, October 3, 2013**

**Whereas**, it appears to the Board that James Barnes sold property securing a debt to Ozark Heritage Bank, N.A. (the "Bank") without repayment to the Bank between July 2012 and April 22, 2013, and

**Whereas**, James Barnes did not discuss the sale of cattle with the Directors' Loan Committee or the Board of Directors during the period from July 2012 through April 2013 when the cattle was sold although he contends he did discuss it with his loan officer, and

**Whereas**, it further appears to the Board that the December 31, 2012 and June 30, 2013 financial statements submitted to the Bank by James Barnes did not disclose all of Mr. Barnes' debts outstanding on those dates, and

**Whereas**, recent activity within Mr. Barnes' deposit accounts with the Bank appear to management and the Bank's compliance expert from Bankers Assurance to be irregular activity, and

**Whereas**, another banking institution has initiated public foreclosure proceedings against Mr. Barnes and he has initiated a countersuit against them as well, and

**Whereas**, the impact of the above actions has negative implications to the Bank as well as to James Barnes, then

**BE IT RESOLVED** that the following motion was approved by all members of the Board of Directors, with the exception of Mr. Barnes:

**Motion** by Buddy Bolin – Despite the explanations provided to the board by James Barnes, some of which may explain certain of the activities under discussion and of concern, I still believe it is in the best interest of the Bank and James Barnes, and therefore hereby move to approve the resolution recommended by the Executive Committee that reads:  Because of the sale of OHB-mortgaged collateral, the apparent lack of disclosure of certain debts on Mr. Barnes' financial statements both at December 2012 and June 2013, as well as the lack of information to the board of directors regarding these matters, and because of the negative impact the public legal action pending against him by another financial institution has on OHB, we regretfully recommend to the Board of Directors that they approve a resolution requesting that James Barnes voluntarily resign his position as Director of Ozark Heritage Bank, N.A. effective no later than Friday, October 18, 2013 at 2:00 p.m.  **Motion** was seconded by David Dunlap.  Following discussion a vote was taken and the **motion carried**.

**BE IT FURTHER RESOLVED** that the Board of Directors believes that it is in the best interest of the Bank for James Barnes to resign as a director of the Bank and therefore requests the voluntary resignation of James Barnes from the Board of Directors of Ozark Heritage Bank, N.A.  effective no later than Friday, October 18, 2013 at 2:00 p.m.

This **Resolution** supersedes and shall replace the Board's prior **Resolution** addressing this matter.