# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

JAMES BARNES                                                                                    PLAINTIFF

v.                                       No. 4:16CV00750 JLH

MARNIE OLDNER; KEVIN COMPTON;
STONE BANCSHARES, INC.;
J.T. COMPTON; NICK ROACH; and
DAVID DUNLAP                                                                                  DEFENDANTS

## OPINION AND ORDER

This case concerns a broken business relationship. James Barnes was the largest shareholder of Ozark Heritage Bank, as well as chairman of the board. He also borrowed large amounts of money from the bank. He is no longer a shareholder and no longer on the board. He has filed bankruptcy. In a far-reaching complaint, he blames the defendants, all of whom are board members, for his resignation as chairman, his departure from the board, the sale of his stock at a price that allegedly was below its fair market value, and his bankruptcy. The present issue is whether he has stated a claim for federal securities fraud. He has not.

**I.**

The following facts are taken from the first amended complaint. Ozark Heritage Bank was formed on March 3, 2009 pursuant to the Securities Act of 1933. As part of the initial public offering, the bank issued 537,566 shares of registered common stock and separate preferred shares. Barnes owned 75,000 shares of common stock—for which he paid $10.00 per share—and 17,500 shares of preferred stock upon the close of the initial offering. This made him the largest individual shareholder. He was elected chairman of the board with 9,800 options.

J.T. Compton was and still is a member of the board. Barnes alleges that in mid-2012, J.T. Compton wanted to buy his common stock at $10.50 per share. The transaction hinged upon Barnes

agreeing to resign from the board by no later than January 15, 2013, or the date he received the funds from the sale. Barnes declined. Then, in early 2013, J.T. Compton convinced a former board member—Carl Cooper—to return. Cooper had threatened to sue the bank during Barnes's tenure as chairman. The board voted to replace Barnes as chairman on April 21, electing J.T. Compton. Defendants Marnie Oldner, Kevin Compton, Nick Roach, and David Dunlap were voting members of the board at the time. On June 18, the board approved a resolution stating that the bank had been successful under Barnes's leadership and that Barnes had been an "untiring champion of the bank." In July, the board told the Office of the Comptroller that given its healthy financial state, it planned for the first time to issue a dividend on its preferred stock. The bank issued a statement that the book value of common stock was $11.86.

Barnes had borrowed a significant amount of money from the bank.[1] On August 12, the loan committee renewed a promissory note issued to James Barnes and Associates, Inc., in the principal amount of $597,555.88. During this time Roach assisted Barnes in preparing his personal cash flow and financial statements. Barnes had also borrowed $250,000 from J.T. Compton. Several board members co-signed a note with Barnes at Homebank of Arkansas so Barnes could repay him. The loan was secured by Ozark Heritage Bank stock. Barnes alleges that, with the knowledge that certain board members helped him repay Compton, Oldner sought advice on how to neutralize the votes of those board members. Oldner also told the Office of the Comptroller that there were "issues" with Barnes's loans. One of these issues involved the sale of cattle, which Barnes had offered as collateral to secure a loan with the bank. The board reported that Barnes sold the cattle

---

[1] As of July 16, 2014, Barnes had four loans with the bank: Loan #602247 with a current balance of $92,412.57; Loan #602488 with a current balance of $141,597.22; Loan #602987 with a current balance of $158,922.39; and Loan #604047 with a current balance of $243,406.35. Document #22-2.

and misappropriated the proceeds. Barnes, however, learned in 2013, that the bank's Farm Service Agency consultant and agricultural lender inspected the cattle, knew they had been sold consistent with the terms of the loan, and reported that information to Oldner and Roach.

The board issued a resolution on September 17, 2013, which stated in part:

> **Whereas**, recent activity with Mr. Barnes' deposit accounts with the Bank appear to management and the Bank's compliance expert from Bankers Assurance to strongly suggest check kiting . . .
>
> \* \* \*
>
> Because of the sale of OHB-mortgaged collateral, apparent misrepresentation of information on his financial statements both at December 2012 and June 2013, as well as the fact that he has not been forthcoming to the board of directors regarding these matters, and because of the negative impact the public legal action pending against him by another financial institution has on OHB, we regretfully recommend to the Board of Directors that they approve a resolution requesting that James Barnes voluntarily resign his position as Director of Ozark Heritage Bank, N.A. . . .

Document #22-4. Barnes initially refused to voluntarily resign, even though the board told him that federal regulators demanded his removal. Then, J.T. Compton, Oldner, and Roach promised Barnes that they would "work with him" on his loans, if he resigned from the board. The board issued a superseding resolution on October 3, which called for Barnes's resignation by October 18. The superseding resolution replaced the reference to check kiting with "irregular activity." *Id*. at 2. Barnes resigned effective on October 18, 2013.

Barnes alleges that the defendants "forced" him off the board in mid-October. Shortly thereafter, on October 27, J.T. Compton e-mailed Barnes and stated that the bank was being "pressured" by the Office of the Comptroller regarding the status of Barnes's loans. Then, on November 4, J.T. Compton "contacted Barnes, suggesting he would loan Barnes funds to facilitate Compton's undisclosed purchase of Barnes's 75,000 OHB shares, at $7.50/share . . ." Document #22 at 19, ¶76. Barnes agreed to sell his shares, but the sale was not "closed" until mid-to late 2014 and the shares were not transferred until late 2014. The defendants also pressured Barnes to sell his

3

cattle farm. He sold the farm on December 28 for $1,650,000. Prior to that, on December 23, he executed a second mortgage on the farm under the threat of foreclosure. Barnes filed Chapter 12 bankruptcy on March 20, 2015.

After Barnes was removed from the board, the bank sought a state charter. The bank also converted a substantial number of preferred shares to common stock, diluting the value of common stock to $8.23 per share. In May 2015, the bank issued a notice to shareholders that there would be a meeting to consider a proposal to convert to a state bank, adopt new articles, and change the name of the bank to "Stone Bank." Those plans were not discussed during the time Barnes was a member of the board or prior to the time he sold his shares to J.T. Compton. By December, Ozark Heritage Bank had become Stone Bank, and J.T. Compton as chairman of the board delivered a notice to shareholders that there would be a meeting for the purpose of considering and voting on a plan of exchange agreement. Pursuant to the agreement, Stone Bancshares, Inc. would acquire all the outstanding common stock of Stone Bank, which would "facilitate future capital infusions."

Barnes commenced this action on October 14, 2016. He claims that the defendants concealed plans to secure a state charter, while lying to him and to federal regulators about the status of his loans with the bank so that he would sell his shares to J.T. Compton at a price below fair market value. The amended complaint includes five causes of action: (1) securities fraud in violation of federal law; (2) violation of the Arkansas Deceptive Trade Practices Act; (3) breach of fiduciary duty; (4) securities fraud in violation of Arkansas law; and (5) civil conspiracy.

Three motions are pending before the Court. The first is a motion to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) filed by the defendants other than Compton. Document #24. These defendants argue that the federal securities law claim is untimely and the complaint does not state a claim upon which relief can be granted. The second

4

is a motion to dismiss pursuant to Rules 9(b) and 12(b)(6) filed by J.T. Compton making similar arguments. Document #26. The defendants also argue that the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. The third is a motion to strike pursuant to Rule 12(f) filed by Barnes. Document #38. Barnes asks the Court to either strike J.T. Compton's reply, which includes documents outside the pleadings, or to convert the motion to dismiss into one for summary judgment pursuant to Rule 12(d). The Court will address these motions in reverse order. For the following reasons, all three motions are granted.

## II.

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Rule 10(c) states: "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Rule 12(d) provides that if on a motion under Rule 12(b)(6) "matters outside the pleading are presented to and not excluded by the court, then the motion must be treated as one for summary judgment under Rule 56." J.T. Compton has attached documents to his reply to Barnes's response to his motion to dismiss. Document #37-1. He argues that the Court may consider the documents without running afoul of Rule 12(d) because they are referenced in the complaint, evidence the sale of Barnes's OHB shares, and dispute dates alleged in the complaint. Document #37 at 4.

Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint, are pertinent to his claim, and their authenticity is not questioned. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (collecting cases); *Arnlund v. Smith*, 210 F. Supp. 2d 755, 760 (E.D. Va. 2002). *See also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1327 (3d. ed.

5

2017) (citing *Sinclair Ref. Co. v. Stevens*, 123 F.2d 186, 189 (8th Cir. 1941)). Because J.T. Compton attached the documents to the reply brief, rather than the motion to dismiss, the Court will not consider them in ruling on the motion to dismiss. It would be unfair to do so without giving Barnes an opportunity to respond and to dispute the authenticity of the documents. *See Divane v. Nextiraone, LLC*, No. 02 C 3899, 2002 WL 31433504 at *2 (N.D. Ill. Oct. 30, 2002). The Court will not convert the motion to dismiss to a motion for summary judgment in order to consider documents attached to a reply brief. As a general rule, courts do not address arguments received for the first time in a reply brief. *Akeyo v. O'Hanlon*, 75 F.3d 370, 374 n.2 (8th Cir. 1996); *Cuningkin v. City of Benton*, No. 4:05CV01130 JLH, 2007 WL 707343, at *4 (E.D. Ark. March 5, 2007); *see also Adams v. City of Manchester*, No. 4:11CV1309 TCM, 2012 WL 3242078, at *4 (E.D. Mo. Aug. 7, 2012) ("'It is well settled that [the Court] do[es] not consider[ ] arguments raised for the first time in a reply brief.'" (quoting *K.C. 1986 Ltd. P'ship v. Reede Mfg.*, 472 F.3d 1009, 1018 n.2 (8th Cir. 2007))). Barnes's motion to strike is granted. Because the Court has excluded the documents, J.T. Compton's motion to dismiss will not be treated as one for summary judgment.

### III.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). The Court accepts as true all of the factual

6

allegations contained in the complaint and draws all reasonable inferences in favor of the nonmoving party. *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 792 (8th Cir. 2014). The complaint must contain more than labels, conclusions, or a formulaic recitation of the elements of a cause of action, which means that the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965.

## IV.

**A.     Whether the Federal Securities Fraud Claim is Timely**

The defendants argue that the federal securities fraud claim is untimely. Document #24; Document #26. Section 10b of the Securities Exchange Act, codified at 28 U.S.C. § 78j(b), makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device . . ." Seventeen C.F.R. § 240.10-b5 implements section 10b:

> It shall be unlawful for any person to, directly or indirectly . . .
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances they were made, not misleading, or
>
> (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase of any security.

Subsections (a) and (c) cover "scheme liability" and subsection (b) covers "false statement liability." *West Va. Pipe Trades Health & Welfare Funds v. Medtronic, Inc.*, 845 F.3d 384, 389-91 (8th Cir. 2016). Barnes alleges claims based on both theories of liability. Document #31 at 4-6. He alleges in the amended complaint:

> With respect to the federal securities claims, at all times relevant there were material misrepresentations and omissions by all the Defendants [1] regarding their

7

willingness to work with Barnes on his loan payouts; [2] concealment of material information regarding the banks plans to convert to a State bank, change its name, change available capital and corporate structure for future plans; [3] institute the preferred stock buy-back; [4] disclosures to the OCC regarding Barnes' loans; and [5] adoption of the executive stock plan; all of which was material information relied on by the Plaintiff in making his decision to sell his OHB shares to J.T. Compton, causing an economic loss to Barnes, as described herein below, as a direct result of Defendants' actionable conduct, all with the intent to deceive, manipulative and defraud the Plaintiff.

Document #22 at 6, ¶10.

28 U.S.C. § 1658(b) provides the relevant statute of limitations:

[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought no later than . . . 2 years after the discovery of facts constituting the violation.

The Eighth Circuit recently addressed what facts constitute a violation of Rule 10-b5 in *West Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d at 388-91. It is unsettled which facts must be discovered to trigger the statute of limitations, but "at a minimum the commission of a deceptive act and scienter are facts constituting the violation." *Id*. at 389 (internal quotation omitted). The court explained that "'discovery' as used in this statute encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known." *Id*. at 389 (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 648, 130 S. Ct. 1784, 176 L. Ed. 2d 582 (2010)). However, the court noted, inquiry notice is not enough. *Id*. at 389.

Barnes argues that he did not discover, nor could he have discovered acting reasonably and diligently, the facts constituting the violation until less than two years prior to October 14, 2016. Based on the allegations in the first amended complaint, Barnes is correct as to some but not all of his claims.

First, Barnes alleges that he did not realize the defendants were not going to work with him on his loans until March 20, 2015, when his corporation—James Barnes and Associates, Inc.—was forced to file Chapter 12 bankruptcy. J.T. Compton and separate defendants Marnie Oldner and Nick Roach falsely promised him that if he quietly left the Board, they would "work with him" on his OHB loans. Document #22 at 7, 16, ¶¶15, 30.

Second, Barnes did not learn of the bank's plans to convert to a state bank until May 2015 Document #22 at 21, ¶43. The plans to switch from a national to state charter "had never been discussed with or disclosed to Barnes while he was on the OHB Board, or before he sold his OHB stock to J.T. Compton." *Id*. The defendants discussed the plans at a meeting in October 2013 after Barnes resigned from the Board. *Id*. at 22-23, ¶¶44, 46.

Third, Barnes maintains that he relied upon material misrepresentations and omissions that the defendants made concerning their plans to initiate a preferred stock buy-back, but he makes no discovery allegation specific to the preferred stock buy-back. Document #22 at 6, ¶10. He alleges:

> On or about April 8, 2014, OHB issued a statement regarding 'book value per common shares outstanding-undiluted', contending that as of March 31, 2014, apparently as a result of the conversion of a substantial number of preferred shares since September of 2013, the book value of OHB common shares was purportedly $8.23. The timing of any alleged conversion of preferred shares was consistent with J.T. Compton's scheme to gain control of Barnes's OHB shares at below fair value, and further false manipulation of the stock.

Document #22 at 20, ¶39. Any federal securities fraud claim based on misrepresentations or omissions made about the buy-back plan is barred by the statute of limitations because a reasonably diligent plaintiff would have learned about the plan when the bank issued a public statement, given that the statement explained that the bank began converting the preferred shares in September 2013 before Barnes sold his stock to J.T. Compton.

Fourth, Barnes alleges that he did not discover that the defendants were lying to the Office of the Comptroller of the Currency about his loans and in turn to him about the federal regulators' conclusions about his loans until 2016. Document #22 at 11, 17-18, ¶¶23, 31, 35. J.T. Compton told Barnes that the OCC was concerned about the bank's loans to Barnes, when in fact the OCC evaluated the loans and did not find them to be problematic. *Id*. at 18, ¶35. The board accused Barnes of selling livestock that he had put up as collateral for a loan from the bank and reported the information to the OCC, but Barnes did not learn until 2016 that bank officials inspected the sale and found that the it was consistent with the terms of the loan agreement. Document #22 at 12, ¶24. Barnes seems to contradict himself in paragraph 31, when he alleges that he was not fully aware of the Board's knowledge about the propriety of the cattle sale until 2015. *Id*. at 17, ¶31. Either alleged discovery date is within the two year statute of limitations.

Fifth, the defendants hid from Barnes their plan to adopt an executive stock plan, about which he did not learn until December 2015 when J.T. Compton issued a notice that a meeting would be held for the purpose of considering a plan of exchange agreement. Document #22 at 22, ¶44.

J.T. Compton argues that "[t]he time period, per 28 U.S.C.A. § 1658(b), commenced, at worst, in September, 2014 when, as described by Plaintiff in his own Complaint and Amended Complaint, he had been, for months pressured to be removed as a OHB director, sell his OHB stock and the stock transaction closed." Document #27 at 5. But the facts constituting the violation are not limited to the events underlying the securities fraud claim. Rather, a reasonably diligent plaintiff must have discovered "facts sufficient to plead scienter" based on those underlying events. *West Va. Pipe Trades*, 845 F.3d at 389. Here, part of the securities fraud claim is based on the fact that Barnes believed the Office of the Comptroller was concerned about his loans with the bank.

10

Therefore, it would be reasonable to think the board wanted him to resign due to pressure from federal regulators. J.T. Compton also argues that Barnes had knowledge as a board member that something was awry and should have heeded the "storm warnings," but the Court must accept Barnes's allegation that "[a]t all times after October 18, 2013[—the date he was removed from the board—], Barnes was an 'outsider' and Defendants were 'insiders', with full access to Barnes's non-public proprietary financial information." Document #22 at 19, ¶37.

Accepting the facts alleged in the amended complaint as true, a reasonably diligent plaintiff would not have discovered the particular facts constituting the defendants' willingness to work with Barnes on his loans; the concealment of the bank's plans to convert to a state bank; the disclosures to the Office of the Comptroller; and the adoption of an executive stock plan until less than two years prior to October 14, 2016, the date Barnes commenced this action. However, a reasonably diligent plaintiff would have discovered the particular facts constituting the initiation of the preferred-stock buyback. The bank announced the buyback in April 2014, including in the announcement that the conversion of shares began as early as September 2013. Barnes was still a member of the board during September 2013 and the announcement shows that the defendants knew about the buyback before Barnes sold his stock to J.T. Compton. Therefore, any securities fraud claim based upon the failure to disclose the preferred-stock buyback is barred by 28 U.S.C. § 1658(b).

**B.     Whether the Amended Complaint Alleges a Claim Upon Which Relief May Be Granted**

J.T. Compton and the separate defendants filed motions to dismiss the federal securities fraud claims pursuant to Rules 9(b) and 12(b)(6). Document #24; Document #26. Barnes alleges under Count I that the defendants violated Section 10(b) of the Securities Exchange Act and Rule 10b-5, which prohibit fraudulent conduct in connection with the sale and purchase of securities, and Section

11

20(a) of the Securities Exchange Act, which creates liability for those who control any person liable for violations of Section 10(b).

"The courts have implied from [Section 10(b) of the Securities Exchange Act and Rule 10b-5(b)] a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005). A securities fraud claim under section 10(b) and Rule 10b-5 based on false statement liability requires (1) a material misrepresentation or omission; (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *McAdams v. McCord*, 584 F.3d 1111, 1113 (8th Cir. 2009) (citing *Dura*, 544 U.S. at 341-42, 125 S. Ct. at 1631). *See also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 165, 128 S. Ct. 761, 773, 169 L. Ed. 2d 627 (2008) (noting that the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b), "imposed heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities Exchange act").

Barnes explains the "essence" of his claims: "Defendants, as officers and members of the OHB Board of Directors, engaged in a scheme to acquire complete control of OHB from Plaintiff through manipulation and deception, in order to turn around and sell the Bank for a substantial profit when the time was 'ripe.'" Document #31 at 2. The misrepresentations alleged in the amended complaint can be broken down into two categories:

(1) Willingness to work with Barnes on his loan payouts.

(2) The OCC's evaluation of Barnes's loans.

The omissions alleged in the amended complaint can also be broken down into two categories:

(1) Information regarding the bank's plans to convert to a State bank change its name, change available capital and corporate structure for future plans.

(2) Plans to adopt an executive stock plan.

The defendants argue that Barnes's allegations are insufficient to establish the requisite causal connection between their wrongful conduct and Barnes's losses. Document #25 at 14. Loss causation is analogous to the common law requirement of proximate causation which requires the plaintiff to prove "a causal connection between the material misrepresentations and the loss." *Dura*, 544 U.S. at 342, 125 S. Ct. at 1631. Loss causation differs from transaction causation, which requires a plaintiff to show that the defendant's fraud induced the plaintiff to purchase the security interest in question. *Schaff v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008). A complaint must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347, 125 S. Ct. at 1634. "The plaintiff must show 'that the loss was foreseeable *and* that the loss was caused by the materialization of the concealed risk.'" *McAdams*, 584 F.3d at 1114 (quoting *Schaff*, 517 F.3d at 550). In other words, Barnes must allege facts to support a plausible inference that the defendants' misrepresentations and omissions concealed the circumstances that bear upon the loss suffered, such that Barnes would have been spared all or an ascertainable portion of that loss absent the fraud.

Barnes repeatedly alleges that if he had known the truth and if he had known the concealed information, "he would not have sold his shares to J.T. Compton . . ." Document #22 at 4, 9, 12, 16-17, 20, 22-23, ¶¶ 6, 17, 23-24, 30-31, 39-40, 43, 46. This is an allegation of transaction causation: but for the defendants' misrepresentations and omissions, Barnes would not have sold his securities to J.T. Compton. *Schaff*, 517 F.3d at 550. He has adequately alleged transaction causation, but he

13

has alleged no facts to support a reasonable inference that the loss he claims to have sustained was caused by the alleged misrepresentations and omissions.

Barnes alleges that he sold the stock to J.T. Compton for substantially below fair-market value. He also says in his brief that he was fraudulently induced to sell his stock and then later the stock increased in value when the bank was sold. Document #31 at 2. Barnes argues that he has sufficiently alleged loss causation by explaining in the amended complaint that he sold the stock for less than its book value and less than J.T. Compton had previously offered. *Id*. at 14. These facts are irrelevant to loss causation, absent allegations explaining why the defendants' fraudulent conduct caused the loss suffered. Barnes must allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005). *See also Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997) ("[T]he plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries."). "By ensuring the only losses actually attributable to a given misrepresentation are cognizable, the loss causation requirement ensures that federal securities laws do not become a system of investor insurance that reimburses investors for any decline in the value of their investments." *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013) (internal quotation omitted).

Barnes does not allege that the subject of the misrepresentations (the bank's willingness to work with Barnes on his loans and the issues federal regulators had with those loans) nor the omission (the plan to establish an executive stock plan) caused the *increase* in stock value that he claims as his loss. The bank's willingness to work with Barnes on his loans, the OCC's evaluation of those loans, and the plan to implement an executive stock plan are relevant only to transaction causation—these misrepresentations and omissions no doubt played a role in inducing Barnes to sell

his stock to J.T. Compton, but they are limited in scope to the transaction and do not affect the value of the stock. Any claim for securities fraud based on these misrepresentations and this omission fails.

The root of Barnes's loss in the securities fraud context is the bank's success after he was removed from the board and sold his stock, because his loss stems from the stock's increase in value. Loss causation is similar to proximate causation—the Court must be able reasonably to infer from the facts alleged that the damages Barnes suffered were a foreseeable consequence of the omission. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d. Cir. 2001). Barnes alleges very little about the effects the sale of the bank and its acquisition of a state charter had on the value of its stock; he says that shortly after he sold his stock, in May 2015, the board issued a notice to shareholders that a meeting would be held to consider a proposal to convert OHB to a state bank, to adopt new articles, and to change the name of OHB to "Stone Bank." Document #22 at 21, ¶43. Barnes does not, however, explain why the conversion from a national to a state bank caused the stock price to increase. It is not self-evident that conversion from a national to a state bank *ipso facto* increases the value of a bank. In fact, Barnes does not even allege in the first amended complaint that there was an increase or that the sale of the bank and conversion to a state charter caused the increase; he only baldly asserts in his brief that it did. Document #31 at 2. Barnes has failed to allege loss causation, an essential element of his claims for federal securities fraud based on false statement.

Second, to allege a claim for scheme liability in violation of Rules 10b-5(a) and (c), Barnes must allege that the defendants "engaged in deceptive conduct separate from any alleged misstatements or omissions." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012). Rules 10b-5(a) and (c) "make deceptive conduct actionable, as opposed to Rule

15

10b-5(b), which relates to deceptive statements." *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 986 (8th Cir. 2012). Barnes argues that he has adequately alleged that Oldner and Roach engaged in deceptive conduct beyond mere misrepresentations and omissions. Document #31 at 5-6. "[A] plaintiff . . . must specify, with particularity, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." *Pub. Pension Fund Grp.*, 679 F.3d at 987 (quoting *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 ( S.D.N.Y. 2006)). For the same reasons Barnes failed to adequately allege loss causation, he has failed to allege what effect the defendants' conduct in further of the scheme had on the securities at issue—the bank stock. The allegedly fraudulent conduct of Oldner and Roach may have been a factor in Barnes's decision to sell his stock, but there are no facts alleging that the conduct had any effect "on the securities at issue."

In paragraph 53 of the amended complaint, Barnes alleges that the defendants "materially aided and facilitated the actions and conduct giving rise to J.T. Compton's liability" and therefore they are "each jointly and severally liable as controlling persons under 15 U.S.C. § 78t." Section 20(a) of the Securities Exchange Act, codified at 15 U.S.C. § 78t, creates liability for those who, directly or indirectly, control any person jointly and severally liable for violations of Section 10(b). The Eighth Circuit has interpreted control "as requiring only some indirect means of discipline or influence short of actual direction." *Lustgraaff v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010)(citing *Farley v. Henson*, 11 F.3d 827, 836 (8th Cir. 1993)). A plaintiff must prove: (1) that a "primary violator" violated the federal securities laws; (2) that "the alleged control person actually exercised control over the general operations of the primary violator"; and (3) that "the alleged control person possessed–but did not necessarily exercise–the power to determine the specific acts or omissions upon which the underlying violation is predicated." *Id*. (quoting *Farley*, 11 F.3d at 835). Barnes

has failed to allege facts from which the Court can infer that a primary violator violated the federal securities laws, so he has failed to state a claim based on control person liability.

C.  **Whether to Exercise Supplemental Jurisdiction Over the State-Law Claims**

Finally, the defendants argue that because the amended complaint fails to state a claim for securities fraud in violation of federal law, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. The Court may decline to exercise supplemental jurisdiction after dismissing all of the claims that arise under federal law. 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, n. 7. 108 S. Ct. 614, 619 n. 7, 98 L. Ed. 2d 720 (1988). The Eighth Circuit has said: "We stress the need to exercise judicial restraint and avoid state law issues wherever possible. We also recognize within principles of federalism the necessity to provide great deference and comity to state court forums to decide issues involving state law questions." *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990). Out of deference and comity to the state courts, the Court declines to exercise supplemental jurisdiction over Barnes's state-law claims. *See Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009).

## CONCLUSION

Barnes's motion to strike is GRANTED. Document #38. The defendants' motions to dismiss are GRANTED as to the claims arising under federal securities law. Documents #24 and #26. The Court declines to exercise supplemental jurisdiction over Barnes's state-law claims. Therefore, this action is dismissed without prejudice.

IT IS SO ORDERED this 13th day of April, 2017.

                                                                                 _____
                                                                                 J. LEON HOLMES
                                                                                  UNITED STATES DISTRICT JUDGE